945 So.2d 194 (2006)
STATE of Louisiana, Appellee
v.
Darryl F. HENDERSON, Appellant.
No. 41,657-KA.
Court of Appeal of Louisiana, Second Circuit.
December 13, 2006.
*198 Peggy J. Sullivan, Monroe, for Appellant.
Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Lea R. Hall, Jr., Assistant District Attorneys, for Appellee.
Before WILLIAMS, CARAWAY and SEXTON (Pro Tempore), JJ.
WILLIAMS, J.
A Caddo Parish Grand Jury returned an indictment charging the defendant, Darryl F. Henderson, with one count of forcible rape, a violation of LSA-R.S. 14:42.1, two counts of aggravated rape, in violation of LSA-R.S. 14:42, and three counts of aggravated kidnapping, in violation of LSA-R.S. 14:44. After a jury trial, the defendant was found guilty as charged on all counts. Thereafter, with regard to the forcible rape conviction, the trial court *199 sentenced the defendant to serve a prison term of 40 years at hard labor without benefit of parole, probation or suspension of sentence. With regard to the aggravated rape convictions, the defendant was sentenced to serve the mandatory term of life imprisonment without benefit of parole, probation or suspension of sentence for each count. The defendant was also sentenced to serve the mandatory term of life imprisonment without benefit of parole, probation or suspension of sentence for each count of aggravated kidnapping. All six sentences were ordered to be served consecutively. The defendant has appealed. Finding no error, we affirm the defendant's convictions and sentences.

FACTS
On January 30, 2002, the victim, E.S.,[1] was walking in her neighborhood, when the defendant approached her in a car. She knew the defendant from the neighborhood. After a brief conversation, the defendant offered E.S. a ride home and she accepted. E.S. soon noticed that the defendant was not driving in the direction of her home. She asked him where he was going, and he did not respond. The defendant then drove to a dark, isolated location where he forced E.S. to have vaginal intercourse with him. The defendant then drove E.S. home and offered her money. At the time of the incident, E.S. was 16 years old and the defendant was 35 years old.
On August 17, 2002, the victim, T.P., was waiting for a ride in front of her home when the defendant approached her in a car and demanded that she get into the car. When she refused, the defendant brandished a gun and ordered her to leave with him. The defendant drove T.P. to a secluded location where he forced her to have both vaginal and anal intercourse with him. The defendant threatened to kill T.P. and went to the trunk of his car to retrieve another weapon. When the defendant went to the trunk of the vehicle, T.P. fled and sought help. At the time of the assault, T.P. was 25 years old.
On April 20, 2003, L.S. was walking in her neighborhood when the defendant, armed with a gun, emerged from a trail, grabbed her from behind and forced her into his car. The defendant drove L.S. to a secluded area where he forced her to have vaginal intercourse with him. L.S. escaped from the moving car as the defendant was driving away from the area. At the time of the incident, L.S. was 14 years old.
At the conclusion of the trial, the jury found the defendant guilty as charged of the forcible rape of E.S. and the aggravated rape of T.P. and L.S. The defendant was also found guilty as charged of the aggravated kidnapping of all three victims.
With regard to the forcible rape conviction, the trial court sentenced the defendant to serve a prison term of 40 years at hard labor without benefit of parole, probation or suspension of sentence. With regard to the aggravated rape convictions, the defendant was sentenced to serve the mandatory term of life imprisonment without benefit of parole, probation or suspension of sentence for each count. The defendant was also sentenced to serve the mandatory term of life imprisonment without benefit of parole, probation or suspension of sentence for each count of aggravated kidnapping. All six sentences were ordered to be served consecutively. The trial court denied the defendant's motion for post-verdict judgment of acquittal and motion to reconsider sentence. The defendant *200 now appeals his convictions and sentences.

DISCUSSION
Sufficiency of the Evidence
The defendant first contends the evidence at trial was insufficient to support his convictions. Specifically, the defendant asserts the state failed to prove that his encounters with the victims were not consensual.
The question of sufficiency of evidence is properly raised by a motion for post-verdict judgment of acquittal. State v. Price, 40,408 (La.App.2d Cir. 12/16/05), 917 So.2d 1201, writ denied, XXXX-XXXX (La. 6/16/06), 929 So.2d 1284; State v. Howard, 31,807 (La.App.2d Cir. 8/18/99), 746 So.2d 49, writ denied, 1999-2960 (La. 5/5/00), 760 So.2d 1190. LSA-C.Cr.P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Price, supra; State v. Combs, 600 So.2d 751 (La.App. 2d Cir. 1992), writ denied, 604 So.2d 973 (La. 1992).
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La. 1992); State v. Bosley, 29,253 (La.App.2d Cir. 4/2/97), 691 So.2d 347, writ denied, XXXX-XXXX (La. 10/17/97), 701 So.2d 1333.
This standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder. State v. Robertson, XXXX-XXXX (La. 10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, XXXX-XXXX (La. 10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir. 5/8/96), 674 So.2d 1018, writs denied, XXXX-XXXX (La. 11/15/96), 682 So.2d 760, XXXX-XXXX (La. 6/26/98), 719 So.2d 1048.
LSA-R.S. 14:41 defines "rape" as follows:
The act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent, and any sexual penetration, however slight, is sufficient to complete the crime.
LSA-R.S. 14:42.1 defines "forcible rape" as follows:
[A] rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes *201 that such resistance would not prevent the rape.

* * *
LSA-R.S. 14:42 defines "aggravated rape" as follows, in pertinent part:
[A] rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

* * *
The testimony of the victim alone in a sexual assault case is sufficient to convince a reasonable fact-finder beyond a reasonable doubt of a defendant's guilt. State v. Rives, 407 So.2d 1195 (La. 1981); State v. Price, supra; State v. Wade, 39,797 (La.App.2d Cir. 8/09/05), 908 So.2d 1220; State v. Elzie, 37,920 (La.App.2d Cir. 1/28/04), 865 So.2d 248, writ denied, 2004-2289 (La. 2/4/05), 893 So.2d 83. Furthermore, such testimony alone is sufficient, even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense by the defendant. Id.
LSA-R.S. 14:44 provides:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
The abduction of a victim with the intent to commit rape constitutes an intent to force the victim to give up something of apparent or prospective value. State v. Harris, 2001-2730 (La. 1/19/05), 892 So.2d 1238; State v. Arnold, 548 So.2d 920 (La. 1989); See also, State v. Hill, 40,023 (La. App.2d Cir. 9/21/05), 911 So.2d 379.
Victim E.S.
On the night of the incident, E.S. accepted a ride from the defendant. After initially driving in the direction of E.S.'s home, the defendant began driving in a different direction. When E.S. asked where they were going, initially, the defendant did not respond. E.S. continued to question the defendant with regard to their destination, and he replied that they were going to "the spot." The defendant drove to Walker Road and eventually turned onto a dead-end street in a dark isolated area. The defendant stopped the car and told E.S. to get out of the car. E.S. refused to comply and made repeated requests for the defendant to take her home. The defendant attempted to physically remove E.S. from the car, and she made an effort to "brace" herself by pressing her feet onto the floorboard of the car and pushing her body into the seat. The defendant eventually dragged E.S. from the car by her arm and leg. He pushed her to the back of the vehicle where he *202 penetrated her vagina with his penis. When the defendant stopped, he pushed E.S. back to the passenger side of the vehicle. He then opened the trunk of the car, removed a red cloth and wiped his penis. He re-entered the car and drove E.S. back to her neighborhood. As E.S. was exiting the car, the defendant offered to pay her, saying, "Do you want some money for that?" E.S. ran to her home and told her cousin and her grandmother about the attack, and the authorities were alerted. E.S. testified that she remained afraid throughout the experience.
Corporal Morgan King of the Shreveport Police Department was dispatched to E.S.'s residence to investigate the report of the rape. After interviewing E.S., Cpl. King drove her to the location of the scene of the crime, and E.S. identified the area where she had been assaulted and pointed out a discarded condom which Cpl. King collected as evidence. Because the crime scene was located outside of the city limits, Caddo Parish officials were contacted, and the matter was turned over to them. Cpl. King testified that he delivered the evidence he had collected to Corporal John Hay of the Caddo Parish Sheriff's Office, who had been dispatched to meet with Cpl. King with regard to the report of the rape.
Cpl. Hay testified that he went to the crime scene, which he described as an "isolated" area. After interviewing E.S. and her grandmother, Cpl. Hay transported E.S. to Louisiana State University Health Sciences Center for a rape examination.
Although E.S. did not know the name of her assailant, she knew where he lived with his mother, and she provided the officers with a description of the vehicle he was driving. Deputy Marianna McClure, the lead investigator on the case, went to the defendant's home and transported him to a sheriff's substation for an interview.
Prior to the interview, the defendant executed a waiver of rights form. During the interview, the defendant agreed to provide a deoxyribonucleic acid ("DNA") sample by signing a consent form. According to Deputy McClure, during the interview, the defendant seemed unconcerned about the seriousness of the accusations. He denied the accusations, stating that he had been with his girlfriend and his sister shooting pool that evening. He was unable to provide the officers with his girlfriend's name, and he could not provide either the location of the visit with his sister or the location of the pool hall. After the defendant's DNA sample was collected, he was returned to his residence.
During the trial, E.S., Cpl. King, Cpl. Hay and Deputy McClure testified with regard to the above facts. The defense presented the testimony of two witnesses: the defendant and his mother, Peggy Jernigan. According to Ms. Jernigan, the defendant and E.S. had been engaged in a boyfriend/girlfriend relationship, and E.S. had harassed the defendant on several occasions.
The defendant denied raping E.S., testifying that he and E.S. had engaged in consensual sex on several occasions. The defendant also denied the kidnapping, stating that E.S. had voluntarily entered his car on the night of the incident. He stated that E.S. may have accused him of raping and kidnapping her because she had become disgruntled after he had engaged in sexual relations with her aunt.
In addition to the testimony, the state introduced DNA evidence to prove its case. Jennifer Valentine, a DNA analyst of the North Louisiana Crime Lab, was accepted as an expert in DNA analysis. Ms. Valentine testified that she performed the DNA analysis on the evidence collected in E.S.'s case, and certified copies of the *203 lab results were submitted as evidence. According to the DNA testing performed on E.S.'s rape kit samples, E.S. and the defendant could not be excluded as donors of the DNA. The results revealed that the DNA was 74 billion times more likely to be from the defendant and E.S. than from another African-American and E.S.
It is clear that the jury found E.S.'s testimony credible and rejected the defendant's assertion that the sexual intercourse was consensual. E.S. testified that the defendant drove her to a secluded area where he dragged her out of the car and forced her to have vaginal intercourse without her consent. She stated that she was afraid and believed that the defendant would hurt her if she resisted.
After reviewing the record and the relevant statute, we find that the evidence was sufficient to support the defendant's conviction of the forcible rape of E.S. Pursuant to the statutory definition of forcible rape, the evidence revealed that E.S. was "prevented from resisting that act by force . . . under circumstances where [she] reasonably believe[d] that such resistance would not prevent the rape." Accordingly, the defendant's argument is without merit.
The defendant also contends that the evidence was insufficient to support a conviction of aggravated kidnapping with regard to E.S. According to the defendant, no kidnapping occurred because E.S. got into his car voluntarily.
During her testimony, E.S. admitted that she accepted the defendant's offer to drive her home and entered his car voluntarily. However, she further testified that when she noticed that the defendant was not driving in the direction of her house, she asked the defendant where they were going, and he did not respond. She objected to being driven to another location, and her repeated requests to be taken home were ignored.
After viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to prove beyond a reasonable doubt that the defendant committed aggravated kidnapping. By taking E.S. to a place other than her home and refusing to take her home, the defendant imprisoned her and then raped her (took something of value). Therefore, the elements required to prove aggravated kidnapping under LSA-R.S. 14:44(3) were satisfied. This argument lacks merit.
Victim T.P.
T.P. testified that on the day of her attack, she was sitting in her driveway waiting for a ride. A green car with a defective windshield approached her and the driver, armed with a gun, demanded that she get into the car. The driver told T.P. that he would kill her if she screamed. The assailant initially drove T.P. to Betty Virginia Park, but left that area and drove to a dead end street behind a church. The assailant stopped the car and ordered T.P. to get out of the car. He ripped her clothing off, told her to put her hands on the back of the car, and inserted his penis into her vagina. After he ejaculated, he inserted his penis into her anus. Thereafter, he ordered T.P. to the ground. He told T.P. that the gun he had was not big enough to kill her, and he went to the trunk of the car to retrieve another weapon. T.P. ran, naked, to a house across the street from the church. The resident of the house allowed T.P. to enter the house, gave her some clothing and called the police. T.P. was taken to a hospital, where she was examined and evidence was collected.
Chris Taylor was living at the house where T.P. ran following the attack. Ms. Taylor testified that a woman was beating on her door and windows, and she looked *204 out and saw that the woman was nude. She let her into the home and gave her an oversized dress to put on. T.P., who was crying and appeared afraid and nervous, told Ms. Taylor that she had been raped. Ms. Taylor called 9-1-1.
Detective Kim Rei of the Shreveport Police Department investigated the rape of T.P. Detective Rei took possession of the rape kit and transferred it to the crime lab for analysis. T.P. provided Detective Rei with a description of the vehicle her assailant was driving. It was later determined that the vehicle fitting the description was registered to the defendant's mother. T.P. identified the defendant as her attacker in a photographic lineup and in open court.
The defendant's mother, Ms. Jernigan, testified that she did not know T.P., but stated that she did not believe the defendant raped her. She stated that she did not believe that the defendant was capable of raping anyone. She stated, "There's too many out there want him [sic]. He don't [sic] have to rape nobody [sic]. All he got [sic] to do is be there, they come to him if that was the case."
The defendant testified with regard to the incident involving T.P. According to the defendant, he and T.P. had an agreement whereby they exchanged sex for money. He stated, "We just had an agreement. I mean, I know she had kids, and when we met, you know, she merely explained to me that, you know, she had needs and she had bills to pay." The defendant stated that he was not sure why T.P. would say that he raped her.
The DNA analysis of T.P.'s rape kit was performed by Michelle Collins.[2] A certified copy of the lab results was introduced into evidence. The results revealed that the probability of finding the same DNA profile as obtained from the defendant was approximately one in 2.32 quadrillion.
We conclude that the evidence was sufficient to support the convictions for the aggravated rape and aggravated kidnapping of T.P. According to T.P., the defendant forced her to enter his car at gunpoint and drove her to a secluded area where he forced her to have vaginal and anal intercourse with him without her consent. When the defendant went to the trunk of the vehicle, the naked T.P. managed to escape to a nearby house.
As stated above, T.P.'s testimony was corroborated by Ms. Taylor, who testified that T.P. knocked on her window and door on the date of the attack. Ms. Taylor testified that T.P. was naked, crying and appeared nervous.
Viewed in the light most favorable to the prosecution, the evidence was clearly sufficient to prove beyond a reasonable doubt that the defendant committed the aggravated rape and aggravated kidnapping of T.P. The evidence established that the defendant, while armed with a dangerous weapon, forcibly seized T.P. and carried her from one place to another with the intent to force her to give up something of value (sexual intercourse) in order to secure her release, and did, in fact, rape her at gunpoint. Consequently, the elements required to prove aggravated rape under LSA-R.S. 14:42(A)(3) and aggravated kidnapping under LSA-R.S. 14:44(1) were satisfied. This argument lacks merit.
Victim L.S.
L.S., who was fourteen years old at the time of the offense, testified with regard to the details of her attack. She stated that on the day in question, she was walking in her neighborhood when a man approached her from behind with a gun. He grabbed her by her shirt and pulled *205 her down a trail to a car, which she described as a red "Alero." He forced her into the car and drove past Bert Kouns Road. He eventually drove to a secluded area and parked behind a church. The assailant told L.S. that if she let him f* * * her, he would give her some money.
The assailant parked the car and opened the passenger door. When L.S. exited the car, the assailant threw her into the back seat. He pulled his pants down and asked L.S. to perform oral sex on him. L.S. refused and a struggle ensued. L.S. hit the assailant on the head with her cellular phone, and he took it away from her. He then grabbed his gun and pointed it at L.S. At this point, L.S. stopped struggling with him. He then forced his penis into her vagina. When he began to ejaculate, he removed his penis, got out of the car, and gave L.S. something to wipe herself with. When they re-entered the car, L.S. opened her door in an attempt to flee. The assailant grabbed her shirt, and her feet were dangling outside the car as she was dragged by the moving vehicle. L.S. hit the assailant's hand until she was able to tumble to the ground. The assailant then sped away, and L.S. ran to the church. A woman came out of the church and assisted L.S. The woman called L.S.'s mother and alerted the authorities. L.S. was taken to the hospital and a rape kit was performed.
Sometime after the incident, L.S. received a telephone call at her home, during which an unidentified caller said, "B* * *h, I'm going to get you." L.S.'s home telephone number was programmed into her cellular phone, which had been taken by her attacker. L.S. identified the defendant as her attacker in a photographic lineup and in open court.
Detective Paula Moreno of the Shreveport Police Department testified that she investigated the rape of L.S. Detective Moreno took possession of the rape kit, and it was later tested by the crime lab. Photographs were also taken of the lacerations on L.S.'s feet which occurred when she was dragged by the vehicle. The photographs were presented into evidence during the trial.
Detective Moreno was able to determine that the defendant's girlfriend, Jacqueline Roberts, owned a red Oldsmobile Alero. A search of the vehicle did not reveal any property belonging to L.S. An arrest warrant for the defendant was executed in California.[3]
During the trial, the defendant denied raping and kidnapping L.S. He testified that he and L.S. had an agreement, stating, "She offered me something, and I offered her something. . . . She offered to give me sexual relations, and I paid her." He further testified that L.S. may have become disgruntled when he refused to allow her to enter his vehicle after she had purchased two small pouches of marijuana.
Ms. Valentine performed the DNA analysis of the samples obtained from L.S.'s rape kit, and a certified copy of the results was admitted into evidence. The results revealed that the DNA was 10.3 trillion times more likely to have come from the defendant and L.S. than from another African-American and L.S.
We conclude that the evidence was sufficient to prove that the defendant committed the aggravated rape and aggravated kidnapping of L.S.L.S. testified that the defendant grabbed her at gunpoint, forced her into his vehicle and drove her to *206 a secluded location where he forced her to have vaginal intercourse with him without her consent. After being dragged with her feet hanging out of the vehicle, she managed to escape from the moving car. Pictures were introduced into evidence which showed the lacerations to L.S.'s feet. Thus, the evidence was sufficient to establish that the defendant, while armed with a dangerous weapon, forcibly seized L.S. and carried her from one place to another with the intent to force her to give up something of value (sexual intercourse) in order to secure her release. While at the second location, the defendant had sexual intercourse with L.S. against her will at gunpoint. This argument lacks merit.
Motion to Sever
The defendant also contends the trial court erred in refusing to grant his motion to sever the counts with regard to each victim. According to the defendant, he was prejudiced by the joinder of the offenses. Specifically, he argues that the case of E.S. was different than the others, and combining the charges bolstered the state's "weak" case. He further argues that the joinder had the effect of painting him as a person with a criminal disposition, and thus, inflamed the jury against him.
LSA-C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
In the instant case, although the offenses involved three different victims, all of the charged crimes were of similar character and each was triable by the same mode of trial. Moreover, the modus operandi of the offenses charged was strikingly similar. In two instances, the defendant approached the victims in a vehicle and drove them to a secluded area. In one instance, the defendant's vehicle was located nearby. The most striking similarity is that in two instances, the defendant forced the victims into the vehicle at gunpoint and drove them to an isolated area located behind a church. Therefore, we find that the offenses were properly joined under LSA-C.Cr.P. art. 493.
Thus, we must determine whether a severance was mandated pursuant to LSA-C.Cr.P. art. 495.1, which provides:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
A motion for severance is addressed to the sound discretion of the trial court, and the ruling should not be disturbed on appeal absent a showing of abuse of discretion. State v. Deruise, XXXX-XXXX (La. 4/3/01), 802 So.2d 1224; State v. Wade, 39,797 (La.App.2d Cir. 8/9/05), 908 So.2d 1220, writs denied, XXXX-XXXX, XXXX-XXXX (La. 6/2/06), 929 So.2d 1251. A defendant bears a heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever. Factual, rather than conclusory, allegations are required. State v. Davis, XXXX-XXXX (La. 5/23/94), 637 So.2d 1012; State v. Wade, supra.
In ruling on a motion to sever, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical *207 and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Deruise, supra; State v. Brooks, 541 So.2d 801 (La. 1989). There is no prejudicial effect from the joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. State v. Deruise, supra; State v. Brooks, supra.
In State v. Brooks, supra, the defendant was charged with the commission of a series of murders in connection with armed robberies which occurred between August 23 and December 28, 1986. After having been convicted of committing four murders, the defendant was later charged with two additional counts of murder, one which was committed on November 9, 1986 and another on November 15, 1986. The defendant filed a motion to sever the counts, arguing that he would be prejudiced by the joinder of the offenses. The Louisiana Supreme Court upheld the denial of the motion to sever, stating,
Under [LSA-C.Cr.P. art. 495.1.], severance need not be granted if prejudice can be effectively avoided by other safeguards. There is no prejudicial effect from the joinder of two or more offenses when the evidence of each offense is relatively simple and distinct, even though such evidence might not have been admissible in separate trials of the offenses because, with a proper charge, the jury can easily keep the evidence of each offense separate in its deliberations. State v. Celestine, 452 So.2d 676, 680 (La. 1984) (citations omitted).
* * *
We find defendant has made no showing, under the standards of art. 495.1 and Celestine, supra, that the joinder of these two murder counts has prejudiced him. The state is not seeking to try a multiplicity of crimes together. The two offenses are relatively simple and the jury is unlikely to confuse the evidence and the charges.
State v. Brooks, 541 So.2d at 804-05.
In this case, our review of the record reveals that the trial court, prosecution and defense referred to the charges as separate offenses at all times during the proceedings. Additionally, both the prosecution and the defense compartmentalized their arguments according to the separate counts. Also, the evidence against the defendant on each count was not complex and was presented in an orderly fashion, allowing the jury to segregate the charges and the evidence. E.S. and Deputy McClure testified exclusively with regard to the rape and kidnapping of E.S.; T.P., Chris Taylor and Detective Rei testified exclusively to the rape and kidnapping of T.P.; and L.S. and Detective Moreno testified exclusively to the rape and kidnapping of L.S. The defendant, his mother and the DNA analyst were the only witnesses to testify with regard to all three of the rapes.
Furthermore, the trial court specifically instructed the jury to consider the counts separately and render a verdict as to each count independently. After reading each count separately, the trial court stated:
When a defendant is charged with multiple criminal offenses, it is incumbent *208 upon the jury to segregate the various charges and evidence. Guilt on one charge does not necessarily prove guilt on the other charges. The jury must consider each charge and evidence separately in reaching a verdict as to each charge.
Moreover, the defendant has not shown that he was prejudiced by the joinder of the offenses. This assignment lacks merit.
Sentences
The defendant also contends the sentences imposed were excessive. Specifically, he argues that the trial court erred in ordering the sentences be served consecutively. The defendant further argues that no serious or debilitating physical injuries were inflicted upon the victims during the commission of the offenses.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La. 1983); State v. Dunn, 30,767 (La.App.2d Cir. 6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La. 1982); State v. Hampton, 38,017 (La. App.2d Cir. 1/28/04), 865 So.2d 284, writs denied, XXXX-XXXX (La. 3/11/05), 896 So.2d 57, 2004-2380 (La. 6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Haley, 38,258 (La.App.2d Cir. 4/22/04), 873 So.2d 747, writ denied, 2004-2606 (La. 6/24/05), 904 So.2d 728.
Second, a sentence violates Art. 1, § 20 of the Louisiana Constitution if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La. 1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, XXXX-XXXX (La. 1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Hogan, 480 So.2d 288 (La. 1985); State v. Bradford, 29,519 (La. App.2d Cir. 4/2/97), 691 So.2d 864.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. LSA-C.Cr.P. art. 883; State v. Mack, 37,174 (La.App.2d Cir. 6/27/03), 850 So.2d 1035, writ denied, 2003-2122 (La. 1/16/04), 864 So.2d 628; State v. Pickett, 628 So.2d 1333 (La.App. 2d Cir. 1993), writ denied, XXXX-XXXX (La. 5/20/94), 637 So.2d 476. It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Mack, supra; State v. Robinson, 33,921 (La.App. 2d Cir. 11/01/00), 770 So.2d 868. All factors in the case are to be considered in choosing *209 whether to impose consecutive or concurrent sentences. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); State v. Mack, supra.
In the instant case, the trial court imposed the maximum sentence for the conviction of forcible rape and the mandatory life sentences for the convictions of aggravated rape and aggravated kidnapping. The court ordered that all of the sentences run consecutively. The trial court reviewed the circumstances of each offense, noting that each victim was devastated by the violent acts committed by the defendant. The trial court stated:
I don't think for one second Darryl Henderson gets it. This is not about sex, it's about victim degradation. It's about violence. I listened to Mr. Henderson's testimony at trial. It becomes abundantly clear that he doesn't get it. He doesn't have a clue as to the fact that he is a predator and that he has sought out young ladies, some of whom may be disadvantaged or challenged in some respects either by virtue of their young ages or other conditions. And he has preyed upon them, degraded them, seized their dignity, and left them injured. . . . He is a serial rapist. He is a predator.
With regard to the defendant's argument that none of the victims suffered severe physical injuries, the trial court opined that the defendant caused severe emotional injuries, which would last a lifetime, to all of the victims.
The trial court also expressed his belief that the defendant could not be rehabilitated, specifically noting that the defendant, who was under the age of 40 at the time of trial, had four previous felony convictions, including one for sexual battery, reduced from an attempted simple rape charge (the victim in that case was 14 years old at the time of the assault). Notably, the trial court considered a packet of information provided by the state that included a chronology of the defendant's previous sexual assaults and sexually deviant behaviors against both relatives and strangers, both in Louisiana and California. Some of the cases are pending, while charges in others have never been formally filed.[4]
*210 The trial court reviewed the reports submitted by the state and referred to them during his remarks prior to sentencing the defendant. The court noted that generally the sentences imposed would be concurrent, but the defendant "clearly fits the exception to that rule."
After reviewing the record, we find that the sentence for the forcible rape, the maximum allowable, was not excessive considering this defendant's criminal history, his previous periods of incarceration, the seriousness of the offense, and the unlikelihood of rehabilitation. Moreover, the defendant's background shows a continuous history of sexual assaults.
With regard to the statutorily mandated sentences imposed on all other counts, the defendant received sentences of life imprisonment without benefit of parole, probation or suspension of sentence. It is the legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies, and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Price, supra; State v. Stokes, 36,212 (La.App.2d Cir. 9/18/02), 828 So.2d 631, writ denied, 2002-2807 (La. 9/5/03), 852 So.2d 1023. The decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature. Id. The assertion that the mandatory life sentence for aggravated rape is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. See, State v. Stokes, supra; State v. Ingram, 29,172 (La.App.2d Cir. 1/24/97), 688 So.2d 657, writ denied, XXXX-XXXX (La.9/5/97), 700 So.2d 505.
There is nothing in the record of this case to suggest that the imposition of the statutorily mandated sentences are excessive, nor are they grossly out of proportion to the seriousness of the offenses. The sentences do not shock this court's sense of justice. Where there is a constitutional mandatory sentence, there is no need for the trial court to justify, under LSA-C.Cr.P. art. 894.1, a sentence it is legally required to impose. State v. Hill, supra; State v. Koon, 31,177 (La.App.2d Cir. 2/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992).
The fact that the sentences on each conviction were ordered to be served consecutively was within the sound discretion of the trial court. Considering the defendant's criminal history and the seriousness of the offenses, these sentences clearly are not excessive.
The defendant also contends the trial court failed to advise him of the delays for filing an application for post-conviction relief. The Louisiana Supreme Court has held that LSA-C.Cr.P. art. 930.8(C), which requires the trial court to inform the defendant of the limitations period for filing an application for post-conviction relief, is supplicatory language which does not bestow an enforceable right on an individual defendant. State ex rel. Glover v. State, 1993-2330 (La. 9/5/95), 660 So.2d 1189.
Nevertheless, in this case, the record reveals that the defendant was properly advised of the delays during the sentencing hearing. The trial court expressly stated, "I'm also required by law to tell you that under Article 930.8 of the Code of *211 Criminal Procedure, you have two years from the date of finality of your conviction of sentence to file any post-conviction relief application to which you may be entitled by law." By this opinion, the defendant should be advised that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922.
This assignment of error is without merit.

ERRORS PATENT
In accordance with LSA-C.Cr.P. art. 920, all appeals are reviewed for errors patent on the face of the record. A review of the record herein reveals two errors patent.
Sentencing Delays
The record reveals that the trial court denied the defendant's motion for post-verdict judgment of acquittal in open court on November 20, 2005, the same day the sentences were imposed. There is no indication in the record that the defendant expressly waived the sentencing delay. LSA-C.Cr.P. art. 873, provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
When the defendant makes no showing of prejudice, the trial court's failure to observe LSA-C.Cr.P. art. 873 is a harmless error, and there is no need to remand for resentencing. State v. Moossy, 40,566 (La.App.2d Cir.3/10/06), 924 So.2d 485, 488 (citing State v. White, 404 So.2d 1202 (La.1981); State v. Drane, 36,230 (La.App.2d Cir.9/18/02), 828 So.2d 107, writ denied, 2002-2619 (La.3/28/03), 840 So.2d 566.)
In this case, the defendant has not objected to the trial court's failure to observe the delay, and there was no showing of prejudice. Thus, the trial court's failure to observe the statute was harmless error.
Motion to Reconsider Sentence
The record before this court does not contain a copy of the defendant's motion to reconsider sentence. Inconsequential omissions or slight inaccuracies in a record do not require reversal, as an incomplete record may nonetheless be adequate for appellate review. State v. Deruise, supra. A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. Id.
In this case, the record was adequate for appellate review, and there is no showing that the defendant has been prejudiced by the omission of the motion to reconsider sentence. The record contains the trial court's ruling and reasons therefor on the motion to reconsider sentence. In the trial court's reasons, it discussed the defendant's claim that the sentences were excessive because they were imposed consecutively rather than concurrently. Moreover, the defendant also argued to this court that the sentences imposed were excessive because they were ordered to be served consecutively, as opposed to concurrently.

CONCLUSION
For the foregoing reasons, the defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The victims' initials are used because of victim confidentiality requirements applicable to the instant case under LSA-R.S. 46:1844(W).
[2] At the time of the trial, Ms. Collins had relocated to Anchorage, Alaska.
[3] The defendant had lived in California for various periods of time, including both before and after these crimes were committed.
[4] The record contains a police report from the Los Angeles Police Department in which the mother of a 12-year-old girl reported that the defendant, who was attending a party at her house, entered her daughter's bedroom and sexually assaulted her by penetrating her vagina with his finger. The alleged assault occurred on December 17, 1997.

Another California police report indicated that on March 27, 2000, a woman was approached by a man in a vehicle. The man offered her a ride, and she accepted. The man drove her to an isolated area where he penetrated her anus with his penis. The defendant was identified as the rapist through a DNA match.
The defendant has also been linked to another rape/kidnapping by DNA evidence. On August 8, 2000, a 16-year-old girl was walking down a street in California. The defendant approached her in a car and offered her a ride. She refused to get into the car, and the defendant continued to follow her and eventually persuaded her to get into the car. He drove her to an isolated parking lot and told her to get out of the car. The victim initially refused, but he forced her out of the vehicle. He attempted to penetrate her vagina with his penis but was unable to achieve an erection. Ultimately, the defendant managed to penetrate her three times with a semi-erect penis. He attempted to force the victim to perform oral sex on him, but she refused. He forced her to masturbate while he masturbated, and he ejaculated on her back and buttocks. The victim was examined and samples were taken from the dried secretions on the victim's back.
There have been other reports of sexually deviant behavior on the part of the defendant. On August 8, 1987, the defendant's mother, Ms. Jernigan, filed a police report, claiming that the defendant had touched her granddaughter's crotch while babysitting her.
There was an additional police report, filed by the defendant's sister, in which she claimed that the defendant had raped her daughter on multiple occasions, from May 1999 through October 1999. The sister of that victim, who was also the defendant's niece, reported that the defendant had forced her to perform oral sex on him when she was four years old in exchange for food. She stated that he would also "grease" her inner thighs and rub his penis there.